IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARIO ARCE, <br><br> Plaintiff, <br><br> v. <br><br> WEXFORD HEALTH SERVICES, BLUM, L.P.N., and DR. BUTALID, <br><br> Defendants. | Case No. 3:18-CV-1348-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a motion for summary judgment filed by Defendants Blum, Dr. Butalid, and Wexford Health Services ("Defendants") (Doc. 112). Also pending before the Court are two motions to strike, one filed by Plaintiff Mario Arce (Doc. 111), and one filed by Defendants (Doc. 118). The Court grants the motion for summary judgment and denies as moot both motions to strike.

### INTRODUCTION

On July 2, 2018, Plaintiff Mario Arce, a prisoner in custody of the Illinois Department of Corrections ("IDOC"), filed this action *pro se* pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville") (Doc. 1). Arce alleges that Defendants Wexford Health Services, Nurse Practitioner Blum, and Dr. Butalid were deliberately indifferent to his serious medical needs by failing to treat his leg injury for compartment syndrome, failing to properly treat his ongoing pain, and disregarding recommendations from

outside specialists, which purportedly caused potentially life-threatening blood clots and permanent damage (*Id.*). Specifically, as to Wexford, Arce claims that Wexford employed an unconstitutional policy or practice for limiting specialist treatment and prioritizing cost-savings, and that Wexford's utilization management process, collegial review, was defective (*Id.*).

Defendants initially asserted Arce's failure to exhaust his administrative remedies as an affirmative defense and subsequently moved for summary judgment regarding the same issue (Docs. 34, 35, 37, 65). That summary judgment motion was denied as to each of the remaining defendants (Doc. 85). Arce is proceeding on three counts of deliberate indifference under the Eighth Amendment, one against each defendant (Doc. 1).

Defendant Dr. Butalid is a licensed medical doctor and was the Medical Director at Pinckneyville from April 2017 to July 2018 (Doc. 30-1). Defendant Blum is a licensed Nurse Practitioner ("NP") and worked at Pinckneyville beginning in May 2017—with an extended leave of absence starting in April 2018 (Doc. 113-2). In their motion for summary judgment (Doc. 112), Defendants argue that the undisputed facts demonstrate Arce received adequate medical attention, and Defendants were not deliberately indifferent to Arce's leg injury.

## FACTUAL BACKGROUND

At the time of the underlying events, from June 2017 to July 2018, Arce resided at Pinckneyville (Doc. 1). While playing soccer on June 18, 2017, Arce sustained a leg injury (*Id.*). Dr. Butalid examined Arce after this incident and sent him to the emergency room at Pinckneyville Hospital (*Id.*). At the hospital, the treating physician diagnosed a

contusion of the right thigh and wanted to test Arce for compartment syndrome[1] (Doc. 21-1, pp. 103-124). To test for compartment syndrome, Arce was transferred to Saint Louis University Hospital ("SLUH") (*Id.*). The SLUH emergency room physician requested an orthopedist to assess Arce's leg (*Id.* at p. 142).

The orthopedist performed the diagnostic test for compartment syndrome, a strike test, on Arce's leg (*Id.* at p. 146). According to the emergency department notes by the treating physician, the orthopedist cleared Arce for discharge after performing two strike tests, and Arce was discharged with a recommended outpatient primary care physician follow-up in a week (*Id.* at p. 138). The emergency department notes by the discharge nurse, however, stated that follow-up should be scheduled with Affinia Healthcare Murphy O'Fallon within two days (*Id.* at p. 142). Arce was released from SLUH with a final emergency department diagnosis of a contusion of his right thigh, no prescriptions, and a recommended follow-up appointment (*Id.* at pp. 138, 142).

Upon returning to Pinckneyville, Arce was placed in the infirmary for observation (and because he returned to the facility after hours) (*Id.* at pp. 4-7, 125). The following morning, treatment notes suggest that Arce reported the "swelling gone down" (*Id.* at p. 7). NP Blum reviewed the notes as to Arce's condition, prescribed Motrin and crutches,

---

[1] Defendants offer the following definition for compartment syndrome, which Arce admits. Compartment syndrome occurs when there is increased pressure in a compartment of the body that results in insufficient blood supply to tissue. For an injury to the thigh that causes bleeding, the compartment can accommodate between 1-2 liters of blood. When looking at either acute or delayed compartment syndrome in the thigh, a provider looks for a continued progression of swelling, changes in sensation, numbness in the top of the foot, and significant pain. A decrease in these symptoms indicates there is no compartment syndrome. The treatment for compartment syndrome is emergent surgery to relieve the pressure, without surgery the pressure may result in tissue death (necrosis) (Docs. 113, 117).

wrote a permit for low bunk and low gallery, and discharged Arce from the infirmary (*Id.* at pp. 6-7). Notes from the infirmary acknowledge the recommended follow-up in the SLUH discharge paperwork of two days at Affinia Healthcare Murphy O'Fallon (*Id.* at pp. 4-7). Blum submitted a request for follow-up the same day to collegial review, Wexford's medical management and approval process (*Id.* at p. 125). In the request, Blum wrote there was no evidence of compartment syndrome (*Id.*). The request for outside follow-up was denied on June 22, 2017, and onsite follow-up was ordered within three to four days (*Id.*).

Six days after the denial, Blum reassessed Arce's injured leg. The assessment revealed a positive pulse, positive cap refill (regaining color after applied pressure), swelling, tenderness to touch, inability to bear weight, bruising, and calf pain (*Id.* at p. 9). Blum's treatment plan called for a physical therapy evaluation, continued crutches, and Motrin for pain (*Id.*). He also referred Arce for an ultrasound to assess deep vein thrombosis ("DVT") due to the calf pain (*Id.*). Blum listed an orthopedic consult to rule out compartment syndrome as a potential treatment option (*Id.*).

In collegial review, the ultrasound was approved, and the orthopedic consult was denied until after review of the results from the ultrasound (*Id.* at pp. 126, 132). An ultrasound was performed in early July revealing Arce had a specific type of blood clot[2] that allows blood to still pass through the vein. (*Id.* at pp. 12, 158). Blum assessed Arce's

---

[2] Defendants contend, and Arce admits, there is no standard time for a blood clot to resolve. It can resolve within weeks or years, or it can remain and never fully dissolve. As there are risks with operating on a person with a blood clotting disorder, including the formation of additional blood clots, long-term anticoagulant treatment is the preferred course of treatment, and surgical intervention is rarely recommended (Docs. 113, 117).

condition as right femoral DVT for which he prescribed anticoagulants and readmitted Arce to the infirmary for monitoring and bloodwork (*Id.* at pp. 12-14).

Two days later, Dr. Butalid saw Arce (*Id.* at p. 21). Arce stated that his leg still hurt (*Id.*). Dr. Butalid noted that the injury was making progress with less pain and swelling (*Id.* at pp. 21, 113-3). He also noticed tightness on the back of Arce's leg and assessed that this was due to DVT (*Id.*). Dr. Butalid did not adjust the current treatment plan after this consultation (*Id.*). During his five-day stay in the infirmary, Arce was monitored multiple times a day, his swelling had gone down, and he could walk with crutches (*Id.* at pp. 13-28). He was discharged with a plan to continue his anticoagulant medications, monitor blood tests, and continue using crutches (*Id.*).

Later the same month, on July 20, 2017, Arce saw Dr. Butalid for a different condition but did mention his ongoing leg pain for which he received a pain-relieving narcotic prescription (*Id.* at p. 30). After presentation to collegial review, it was decided that onsite treatment was still appropriate as Arce's condition was not worsening (*Id.* at p. 160). Continued assessment of Arce's response to anticoagulants and physical therapy were recommended (*Id.*). Arce participated in physical therapy from August to November 2017, which helped with the swelling and range of motion (*Id.* at pp. 33-60). Arce reported varying levels of pain throughout physical therapy (*Id.*). Blum saw Arce on August 23, 2017, August 30, 2017, and September 18, 2017 (*Id*. at pp. 39, 42, 46).

In late September, Arce's physical therapist requested a consultation with Blum noting improved range of motion but recent increased pain in a different location, recommending that Blum consider a repeat ultrasound to check for a possible new blood

clot (*Id.* at p. 170). Blum approved that recommendation (*Id.*). It is unclear in the record whether or not this ultrasound was ever ordered or if it was denied at any point.

Arce complained of leg pain again on October 27, 2017 (*Id.* at p. 54). After assessing these complaints, Blum prescribed a nerve pain medication and scheduled a follow-up appointment (*Id.*). In late November, a physical therapy progress note stated that no significant improvement had occurred since the prior progress note and the benefit of future physical therapy was questionable (*Id.* at p. 156). Arce's physical therapy was discontinued. About a week later, Arce reported right leg swelling and was sent to the emergency room for assessment (*Id.* at p. 63). A CT scan, ultrasound, and additional tests were performed, and Arce was diagnosed with a contusion (*Id.* at p. 165). The ultrasound results did not show any additional blood clots (*Id.*). The hospital discharged Arce with a recommendation for Ibuprofen or Naprosyn, a continuation of his anticoagulant, and a follow-up in a week (*Id.*). About a month later, Blum renewed Arce's low bunk, low gallery, and crutch permits (*Id.* at pp. 64-69).

In March 2018, Arce reported that he suffered from soreness in both legs and that his pain medication was inadequate (*Id.* at pp. 69-70). Dr. Butalid examined Arce's leg and noticed swelling in both thighs, ordered a warm compress, and prescribed Neurontin, a nerve pain medication (*Id.*). Dr. Butalid also ordered an ultrasound, which was performed and revealed a blood clot (*Id.* at pp. 69-70, 199). From March 2018 to July 2018, Arce complained of continued swelling and bruising in his leg, although he presented good range of motion, which caused Blum, Dr. Butalid, and other non-defendant medical providers to order pain medication, lab testing, follow-up visits, and

another ultrasound (*Id.* at pp. 71, 76, 79-80, 83, 86). This ultrasound, taken at the end of July 2018, showed no evidence of DVT, and the blood clot had resolved (Doc. 113-5, p. 21).

Arce's condition appears to have improved as he does not require crutches, can exercise, and can participate in physical labor (Doc. 113-1). Arce reports that he is not at his pre-injury condition, remains on blood thinners, and still experiences pain in his leg (*Id.*). Arce's right thigh was assessed by medical providers at Dixon Correctional Center, where he resided in 2021, and he presented no swelling, no pain with palpation, and a steady gait (Doc. 113-1, 117).

LEGAL STANDARD

I. **Summary Judgment**

Summary judgment is proper only if the moving party can demonstrate "that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of triable fact. FED. R. CIV. P. 56(e); *see Celotex*, 477 U.S. at 322-24. A moving party is entitled to judgment as a matter of law where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact. *Durling v.*

*Menard, Inc.*, No. 18 C 4052, 2020 WL 996520, at *2 (N.D. Ill. Mar. 2, 2020) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)).

A court's role in evaluating a motion for summary judgment is not to assess the weight of the evidence, to judge witness credibility, or to determine the truth of the matter. Instead, the Court is to determine whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportwear Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## II.     Eighth Amendment Deliberate Indifference to Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir.

1996) (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Gaston v. Ghosh*, 11-CV-6612, 2017 WL 5891042, at *11 (N.D. Ill. Nov. 28, 2017) (citing *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017)).

To succeed on a claim of deliberate indifference, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014)) (internal quotation marks omitted).

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to prisoner health. *Id.* at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409; *see also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) ("isolated occurrences of deficient medical treatment are generally insufficient to establish . . .

deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry*, 604 F.3d at 440 (citing *Gayton*, 593 F.3d at 620).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry*, 604 F.3d at 441. A delay in treatment may also show deliberate indifference if it "exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F. 3d 768, 777-78 (7th Cir. 2015). Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment. *Id.* at 778.

To prevail on a claim of deliberate indifference against a private corporation, the plaintiff must show that the entity maintained an unconstitutional policy, practice, or custom that caused the constitutional violation. *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). If no individual defendant violated the plaintiff's constitutional rights, a private corporation may still be liable if its "institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc). However, the plaintiff "must show more than the

deficiencies specific to his own experience." *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016) (citing *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010)).

A plaintiff must show: (1) the entity's practice violated his constitutional rights; and (2) the practice was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527, 209 L. Ed. 2d 260 (2021). "This requires more than a showing of one or two missteps." *Id.* (quotation omitted). There must be "systemic and gross deficiencies," of which policymakers were aware and failed to correct them, thereby "manifesting deliberate indifference." *Id.*

## ANALYSIS

### I. Deliberate Indifference to Arce's Medical Needs

Defendants argue that summary judgment is appropriate because there is no genuine issue of material fact, and the facts in the record demonstrate no deliberate indifference to Arce's serious medical need.

Defendants do not dispute that Arce's leg injury constitutes a serious medical need. They argue primarily that they did not disregard Arce's medical needs and treated the condition until symptoms improved. Accordingly, the Court will only consider whether the record on summary judgment demonstrates that Defendants were deliberately indifferent to Arce's leg injury.

#### a. Dr. Butalid and Nurse Practitioner Blum

Dr. Butalid evaluated Arce on several occasions, including the day of his initial injury. Upon initial examination of Arce's leg injury, Dr. Butalid sent Arce to the

emergency room for diagnostic testing immediately. Arce's medical records from SLUH indicate that the test for compartment syndrome, a strike test, was performed twice by an orthopedic specialist. The notes from Arce's treating physician at the hospital do not recommend emergent surgery, the only treatment for compartment syndrome. The records also indicate contradicting follow-up timelines. The hospital's nurse practitioner recorded in Arce's discharge notes that follow-up was recommended within two days, however, the treating physician's notes indicate that the orthopedist recommended outpatient primary care physician follow-up within a week. The hospital discharged Arce with a diagnosis of a contusion.

After the emergency room, when Arce returned to the infirmary, he was prescribed Motrin for pain. The same day, Blum sent a request to collegial review for follow-up in two days at the location listed in the hospital discharge notes. In the request, he also wrote that there was no evidence of compartment syndrome.

Arce argues that Dr. Butalid and Blum were deliberately indifferent because they failed to rule out or treat him for compartment syndrome, and they disregarded outside specialist recommendations regarding surgery and follow-up times.

Arce's initial injury was immediately treated by Dr. Butalid as Arce was sent to the emergency room. Importantly, Arce does not offer any evidence that he actually suffered from compartment syndrome. He also does not offer any support that surgery was recommended by the hospital's orthopedist. The discharge notes indicate that the orthopedist cleared Arce for discharge and for primary care follow-up, which contradicts a diagnosis of compartment syndrome, as the only treatment is emergent surgery. The

evidence also does not demonstrate that Blum or Dr. Butalid knew of a diagnosis of compartment syndrome or a recommendation of surgery and deliberately disregarded that recommendation. Blum and Dr. Butalid could not have disregarded the outside specialist's recommendation for surgery, because the discharge documents did not include such a recommendation. Further, Blum did input a request for a two-day follow-up at the location listed in the nurse practitioner's discharge notes. Blum did not disregard the recommendation for follow-up, and he did not wait to submit the request for it, as his request was filed the same day Arce returned from the emergency room.

Blum's request was subsequently denied in collegial review as it was deemed medically unnecessary because Arce was not showing signs of compartment syndrome. Blum reassessed Arce ten days after the initial incident. This appointment fell outside the one-week follow-up recommended in the hospital treating physician's discharge notes, as well as the timeline of three to four days ordered in collegial review. But there is no evidence that indicates that Blum or Dr. Butalid caused this delay. Even if either of them did cause the delay, Arce has failed to produce verifying medical evidence showing that the delay in this follow-up visit "caused some degree of harm" in ultimately treating his condition. *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm."). In fact, medical records indicate that the failure to conduct this follow-up appointment did not delay Arce's treatment,

because his symptoms were not consistent with compartment syndrome, and emergency surgery was not required.

At Arce's follow-up appointment, Blum prescribed physical therapy, crutches, Motrin, low bunk permits, low gallery permits, and requested an ultrasound to assess if Arce suffered from DVT. Blum also renewed the request for an orthopedic follow-up.

In collegial review, the ultrasound was approved as the first diagnostic test, and the orthopedic follow-up was denied. Blum, Dr. Butalid, and a Wexford representative, Dr. Glen Babich, testified that Arce presented symptoms of DVT, and the proper way to diagnose DVT is through an ultrasound. Sending Arce to an outside orthopedic specialist would have actually caused unnecessary delay in diagnosing and treating his DVT. The ultrasound revealed a blood clot and further supported the diagnosis of DVT for which Blum prescribed anticoagulants, ongoing monitoring, and bloodwork. Dr. Butalid treated Arce on other occasions and also assessed that the type and severity of his symptoms pointed to DVT.

While the initial request for follow-up was denied and internal follow-up took ten days, Arce does not offer any evidence that this delay exacerbated or caused any of his symptoms or ongoing pain rather than the baseline level of pain associated with his underlying condition of a contusion and blood clot. This is not like other cases, where a delay in treatment led to an exacerbation of an injury that could have been avoided without delay.

Arce also participated in physical therapy for four months and reported fluctuating levels of pain and swelling along with improved range of motion. Dr. Butalid

and Dr. Babich testified that these outcomes are inconsistent with compartment syndrome. Over the course of treatment, Arce's physical therapist brought concerns to Blum's attention. The medical records indicate that Blum acknowledged the concerns, filed subsequent requests to collegial review, and prescribed different pain medications at the physical therapist's recommendation including nerve pain relievers. Based on one of the physical therapist's recommendations, in late September, Blum approved an ultrasound. The medical records do not show that this ultrasound ever occurred. The fact that this ultrasound was never performed does not show deliberate indifference, though, as Arce presented no evidence that Blum or Dr. Butalid were responsible for the delay or failure to schedule this ultrasound. Further, an ultrasound two months later indicated that no new blood clots had developed, so this delay in the ultrasound also does not appear to have exacerbated his symptoms or caused Arce harm.

When the physical therapist opined that the treatment may no longer be necessary, Arce was pulled out of physical therapy. Neither Blum nor Dr. Butalid persisted in this treatment option that would be ineffective if continued. In late November, when Arce's symptoms seemed to take a turn for the worse, he was sent to the emergency room and another ultrasound was performed. At this evaluation, Arce was also only diagnosed with a contusion.

The record indicates that Blum and Dr. Butalid exercised their professional judgment to treat DVT symptoms. Arce does not offer any evidence that this medical approach was inappropriate to treat his symptoms. Arce's third ultrasound in 2018 revealed that the blood clot had resolved, he was not at risk for loss of his leg, and he

showed no signs of necrosis which are symptoms of undiagnosed compartment syndrome.

Arce also argues that Blum and Dr. Butalid were deliberately indifferent because they failed to adequately treat his high levels of ongoing pain. He claims that at the time of the original incident Dr. Butalid did not prescribe any pain medication, even though Arce was in a lot of pain at the time. His treating physicians at the emergency room, however, also did not prescribe pain medication upon discharge. Arce contends that the Motrin prescribed the next day by Blum was insufficient to address his pain and that Blum and Dr. Butalid would not prescribe stronger pain medications. Arce claims that Blum told him that stronger medication could not be prescribed because corporate would not approve them, and many are addictive. Arce also claims that he never received several medicines he was prescribed.

Even construing all facts and inferences in favor of Arce, no evidence of deliberate indifference exists on behalf of Blum or Dr. Butalid for failure to treat Arce's ongoing pain. Both medical providers prescribed a variety of pain medications upon complaints from Arce over the course of his treatment—including nerve pain medication and narcotics. There is no allegation that Blum or Dr. Butalid were responsible for Arce not receiving his medication or that they knew about it. Blum and Dr. Butalid approached pain management conservatively and adjusted Arce's prescriptions upon complaint. Preference of one pain medication over another does not give rise to a deliberate indifference claim, as prisoners "are not entitled to receive 'unqualified access to healthcare.'" *Burton v. Downey,* 805 F.3d 776, 787 (7th Cir. 2015). Further, the Eighth

Amendment does not guarantee complete pain relief or recovery, just the absence of reckless care. *Armstead v. Marandet,* 2021 WL 5492983, * 2 (7th Cir. 2021) (citing *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996)).

Clearly, Arce was dissatisfied with his medical care, but there is insufficient evidence to show that Blum and Dr. Butalid were deliberately indifferent to his serious medical need. Conversely, the record indicates that Defendants did not disregard an excessive risk to Arce's health, as Arce's leg injury was continuously treated under the discretion of prison medical staff. Furthermore, his leg improved with treatment although he reported fluctuating levels of pain throughout the process.

Based on these facts, no reasonable jury would find that Defendants Blum and Dr. Butalid intentionally or recklessly disregarded a risk to Arce's health, and the facts are inconsistent with a malicious state of mind. Instead, the evidence indicates that Blum and Dr. Butalid used professional judgment in choosing what they believed to be the best course of treatment for the diagnosis of DVT, and, although not quickly, Arce's leg injury improved as his blood clot resolved and his swelling and pain reduced. Further, to infer deliberate indifference on the basis of a physician's treatment decision, the decision must be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Arce offers no evidence to suggest such a departure in this case. While Arce's treatment does not seem completely seamless, it does not rise to the level of deliberate indifference. On this record, the Court finds that Defendants Blum and Dr. Butalid are entitled to summary judgment on Arce's deliberate indifference to medical

needs claim.

### b. Wexford

Arce claims that Wexford had an unconstitutional policy or practice for limiting specialist treatment and prioritizing cost-savings. He asserts that Wexford's utilization management process, collegial review, is defective. He also argues that Wexford does not have a policy in place relating to the IDOC grievance system.

On the present record, a finding of liability is unsupported. On its face, Wexford's policy and promotion of cost-savings does not violate Arce's constitutional rights. One of Wexford's representatives, Dr. Glen Babich, testified that costs of treatments and medications are balanced with patient needs and that delaying care or allowing medical conditions to fester can actually be more expensive. Wexford's website also indicates that cost-savings do not have a negative impact on the quality of patient care. There is no evidence in the record to support the contention that patient needs are habitually and deliberately disregarded in the name of saving costs, nor is there evidence to suggest that Arce's specific needs were disregarded solely because of costs. Without more, Wexford's policy of promoting cost savings and reducing specialist visits cannot be said to violate Arce's constitutional rights under the Eighth Amendment.

In terms of the delays that Wexford arguably caused with follow-up care after Arce's return from the emergency room, the Court must evaluate if there is a genuine issue of material fact as to whether Wexford's acquiescence to the scheduling delays unnecessarily prolonged his pain based on the seriousness of Arce's condition and the ease of providing treatment. *See Baker v. Wexford Health Sources, Inc.*, 118 F. Supp. 3d 985,

1001 (N.D. Ill. 2015). Just as the analysis with the individual defendants, Arce does not offer any evidence that this delay exacerbated or caused any of his symptoms or ongoing pain rather than the baseline level of pain associated with his underlying condition of a contusion and blood clot. Arce does not offer evidence that he had compartment syndrome that required expedient follow-up.

With Arce's argument about a lack of policy between Wexford and IDOC to review the grievance process, Arce does not show that this lack of policy resulted in a violation of his constitutional rights. Arce was still able to, and did, raise his complaints to the medical staff at the prison including his physical therapist, nurses, and physicians.

On this record, Arce does not show that Wexford's practices violated his constitutional rights under the Eighth Amendment. As such, Wexford is entitled to summary judgment.

## Conclusion

For these reasons, the motion for summary judgment filed by Defendants Blum, Dr. Butalid, and Wexford Heath Services (Doc. 112) is **GRANTED**. As such, Defendants' Motion to Strike (Doc. 118) and Arce's Motion to Strike (Doc. 111) are **DENIED as moot.** The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

DATED: March 24, 2022

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**